*706 OPINION OF THE COURT
Philip S. Straniere, J.
Plaintiff, Mary Beth Acquino, commenced this action against the defendant, Gilbert Ballester, seeking to recover monies paid to defendant in regard to the rental of an illegal apartment. A trial was held July 24, 2012. Both sides appeared without counsel.
Plaintiff testified that she rented a basement apartment from the defendant at 45 Elm Street, Staten Island, New York, in June 2011 and entered into occupancy on July 15, 2011. She posted a security deposit of $1,400 but $200 has already been returned to her. Her monthly rent was set at $1,200 which she paid for one year. In addition she paid $1,400 to a real estate broker for locating the apartment and her church gave her $700 towards the first month’s rent. In June 2012 she learned from the marshal and Brooklyn Union when they came to remove the first floor apartment gas meter that the apartment was illegal. She stated that there were four apartments in the building. The basement where she lived, the first and second floor, and the attic where she believed the defendant lived.
Plaintiff is seeking the refund of the rent she paid for one year as well as moving costs of $4,400.
Defendant in his answer claimed he never had a relationship with the plaintiff, but filed a counterclaim asserting the plaintiff damaged the property. Defendant stated that he owned the house and that he only rented the first and second floor. He could not remember how long he had owned the property but thought it was maybe four or five years. Plaintiff admitted that the defendant’s brother held himself out initially as “Gilbert Ballester” but that later she paid rent directly to the defendant.
What makes defendant’s testimony less than credible is that he evicted another tenant from the illegal basement apartment in 2009 (Ballester v Rivera, L&T No. 53932/09). That proceeding was brought as one for nonpayment of rent but was converted to a holdover proceeding by a “so ordered” stipulation. Apparently the tenant was not aware of the illegality of the apartment as that defense was not raised nor was the status of the apartment indicated in the stipulation.
A search of the county clerk records shows that the defendant purchased the premises on May 11, 2007. The mortgage entered into by the defendant to fund the purchase of the property recites that it is “improved by a 1 or 2 family dwelling.”
*707 The Buildings Department records disclose that there is no certificate of occupancy for 45 Elm Street, which means the premises is either totally illegal, or more likely that the building was constructed prior to January 1, 1938 when New York City began requiring certificates of occupancy.* Buildings Department records support the plaintiffs testimony in that on July 12, 2012 a vacate order was issued because there were illegal apartments in the basement and the attic of the premises. The violation based on an inspection states, “created two illegal class ‘A’ apartments, one in basement & one in attic. Attic apt occupied, no second means of egress.”
This court has held on numerous occasions that no landlord-tenant relationship can exist where there is an illegal apartment (Fazio v Kelly, 2003 NY Slip Op 51276[U], *9-10 [2003] [“(N)o owner ... of any building shall permit any person to occupy a cellar as defined in Multiple Dwelling Law 4(37) for living purposes unless a permit has been issued” (quoting NY City Health Code [24 RCNY] former § 131.07)]; see also Administrative Code of City of NY § 27-2087). There is no showing whether the apartment was in a cellar or a basement under Multiple Dwelling Law § 4 (37) and (38), respectively. In any case a permit is needed to make such an occupancy legal whether it is a cellar or a basement. It is hornbook law that the court will not enforce an illegal contract.
As this is an illegal occupancy, any agreement between the parties is unenforceable. Multiple Dwelling Law § 302 (1) (b) provides: “No rent shall be recovered by the owner of such premises for said period, and no action or special proceeding shall be maintained therefor, or for possession of said premises for nonpayment of such rent.” Although there is no statute prohibiting the collection of rent from illegal one- and two-family dwellings, no rent is recoverable because the contract is illegal, the apartment is presumably unsafe because it is not built to code, and public policy requires such a finding. Not to do so encourages people to ignore the law and place the health and safety of the building’s occupants and first-responders at risk.
*708 Cases that have allowed landlords to collect rent on illegal apartments in one- or two-family dwellings are correct, the Multiple Dwelling Law does not apply. However, to accept that analysis ignores the fact that the Multiple Dwelling Law is not the “tenant rent relief” act but that it is a safety statute designed to insure that renters in New York City are living in buildings constructed and maintained in compliance with building and safety codes. Are not tenants in one- or two-family houses entitled to the same safety protections as those in multiple dwellings?
Further if there is a fire in a one- or two-family dwelling with an illegal apartment and the homeowners’ insurance carrier disclaims on that ground, who will ultimately absorb the costs incurred by that event? Probably the public at large. Without having the “stick” of not being able to collect rent on all illegal apartments available to the courts to use against landlords there is nothing to prevent a landlord from creating a revolving door of one tenant after another being put at risk by the continuing rental of illegally-created apartments.
There is a section of the New York City Administrative Code in regard to the Buildings Department which takes the failure to comply with the building code rather seriously including the assessment of criminal penalties in addition to civil fines (§ 28-203.1; see § 28-201.1). The section provides that “violations of this code, the 1968 building code, the zoning resolution or other laws or rules enforced by the department shall be punishable by criminal fines and imprisonment” (Administrative Code of City of NY § 28-203.1 [authorizing fines between $500 and $25,000, and incarceration of up to one year]).
With this and other Administrative Code sections placing substantial financial penalties on persons engaged in violating the building code, why would it be permissible to reward a landlord by letting him collect rent on an illegal apartment? Because under that scenario, a landlord could obtain a money judgment and either have that judgment enforced through the legal process allowing him to collect rent on an apartment existing in violation of the law or, if the tenant paid the rent due, that tenant could remain in possession of an apartment which by definition is not in compliance with the building code. The court would be participating in the continuance of the illegal and by definition unsafe occupancy. That cannot be the law. To make sense the law has to be that the tenant must vacate the illegal unit as soon as possible, immediately if a vacate order is *709 issued, and the landlord is prohibited from collecting any rent. Otherwise there is no reason for anyone to correct the illegal conditions.
Because the apartment is illegal, the plaintiff cannot recover rent paid to the defendant. Plaintiff like any other tenant has constructive notice of the legality of the premises. She had the ability to check out the legality of the premises prior to entering into occupancy.
Anyone with access to a computer can go to “nyc.gov,” input the address of the premises at both the Buildings Department and HPD (Department of Housing Preservation and Development) headings and find out whether the premises is legal and what violations have been assessed against the premises by these and other agencies. Owing to the number of cases where tenants are receiving governmental subsidies for rent and are in illegal apartments, this information may be news to the persons in charge of those programs.
Although the plaintiff cannot recover the rent she paid to the defendant from the defendant, she can commence an action against the real estate broker who placed her in the apartment. Plaintiff was assisted in locating this apartment by a real estate broker, Virtual Real Estate, 693 5th Avenue, Brooklyn, New York. A broker is a “licensed professional” charged with having greater knowledge of the real estate industry than the general public and has a professional obligation to check these governmental websites to insure that the representations of the landlord or seller are accurate and the premises are legal and can be used for the purpose for which the client is seeking the broker’s advice and assistance.
This court has held licensed real estate brokers to a higher standard than their uninformed clients (Olukotun v Reiff, NYLJ, Aug. 18, 2004 at 19, col 1). As noted in that case, Real Property Law § 441 (1) (b) provides that the holder of a real estate license should have “competency to transact the business of real estate broker in such a manner as to safeguard the interests of the public.” There is similar language applying that standard to real estate salespersons (Real Property Law § 441 [1-A] [b]).
Plaintiff may commence a new action against the real estate broker to recover the monies she expended for rent for one year owing to the broker’s failure to check the legality of the premises the broker assisted in renting to the plaintiff.
The above being said, the plaintiff is entitled to recover her entire security deposit of $1,200 because the defendant is not *710 entitled to keep it when the apartment is illegal and so unsafe that a vacate order had to be issued. Defendant’s counterclaim is dismissed on the merits. He presented no proof that the plaintiff damaged the apartment.
Plaintiff can also recover the monies she had to expend to move to a new apartment in July 2012 which totaled $4,400 as she would not have had to expend that money to move on short notice but for the illegality of the defendant’s apartment.
She will have to commence a separate action against the broker to recover the fee she paid to him for his incorrect advice.
Judgment for plaintiff in the amount of $5,600 with interest from June 18, 2011 when she posted the deposit, costs and disbursements.

 The other possibility is the myth that exists that all of the building records on Staten Island were destroyed in a fire which started when the San Francisco earthquake scared Mrs. O’Leary’s cow who kicked over a lantern which started a fire causing an explosion at the Black Tom munition factory in Jersey City, New Jersey during World War I, often blamed on German saboteurs, the sparks of which burnt the records on Staten Island.